# EXHIBIT B



PO Box 275
Bryn Mawr, PA 19010
610 524 1234 V - 610 524 9023 F - 484 614 7210 C
info@autoclaimshelp.net / www.autoclaimshelp.net

**DRAFT**

10-7-14

Matt Weisberg
Weisberg Law Offices, PC
t/a Consumer Justice Alliance
7 S. Morton Ave.
Morton, PA 19070

Re: 2008 Nissan Altima S #1N4AL21E38N450036, Giancardo Guidoi

On this day I inspected the above referenced vehicle at the new owner's (Shania) residence in Patterson, NJ. The focus of my investigation was the determination of damage which pre-existed Mr. Giancardo's purchase of the Nissan, its condition, fitness, merchantability, value and safety.

In preparation for this report I reviewed the following documents furnished by your office:
1. Lease from Paramus Hyundai for new Santa Fe with trade allowance of $2,500 for subject vehicle.
2. Warranty (aftermarket) registration
3. Invoice from Paramus Hyundai for optional equipment
4. Receipt for $1,000.00 down payment
5. NJ insurance card and registration
6. CarFax VHR (clean) 4-26-2011
7. CarFax (showing accident and structural damage) 1-18-14
8. Business card Richard Caballero of Majorworld (dealer)
9. Personal references for Majorworld loan
10. Power of attorney
11. Limited warranty Majorworld
12. Major privacy notice
13. Major rescission agreement
14. Major arbitration agreement
15. NJ temporary insurance card
16. Liberty Mutual Insurance policy
17. Major sales invoice to Gloria Hernandez et al
18. RISC
19. Invoice Major Chevrolet



The subject vehicle is shown in the above photo. It is a 2008 Nissan Altima convertible 107,030 miles on the odometer on the date of my inspection. The current Kelley Blue Book value is $7,167.00 for an identical Nissan in fair condition and without the history of collision damage.



The left side body panels paint film thickness is shown in the above image. One will note the inconsistency in the readings based on the fact there were body repairs and repainting on the left front door and quarter panel. One will note the inconsistency of the readings, an obvious indicator to a dealer conducting a pre-sale inspection for a vehicle being retailed to the public. There is an issue of durability of non-factory finishes as they have over the years been prone to failures due to inconsistency in technician training, facilities and equipment



The right side body panels paint film thickness is shown in the above image. One will note the inconsistency of the readings, an obvious indicator to a dealer conducting a pre-sale inspection for a vehicle being retailed to the public. There is an issue of durability of non-factory finishes as they have over the years been prone to failures due to inconsistency in technician training, facilities and equipment. Checking paint film thickness is a standard and simple procedure in the auto trade. This is an obvious item which any person in the automotive profession would have noticed and would have been uncovered in a standard presale inspection by a dealer selling vehicles in the retail market.



The above photo shows the left fender forward bolt with the distinctive tool marks of collision damage and repairs. Anyone in the industry would have seen this and a conscientious dealer would have investigated further.



*The above image shows the rear-most left fender mounting bolt. One can easily see that the hole in the fender flange had to be relieved in order to install the bolt. This is indicative or two things: that the car's structure is distorted, and that the repairer was aware there was something wrong with the car's unibody and took steps to conceal it from the customer/owner. This condition would have been obvious to anyone in the trade and should have triggered a more thorough investigation into its cause.*



*The above photo shows some unrelated damage to the rear bumper cover on the right side.*



*The above image was captured from the lease for the new Hyundai for which the subject Altima was traded. Note the trade in allowance for the Altima of #2,500.00.*



The above image was captured from the CarFax VHR on the subject vehicle. One will note the first two line items in the report indicating Structural Damage as well as Accident/Damage reported. These are very significant in that consumers first and foremost concern when buying used cars is accident history and damage.



The above image was captured from the second CarFax VHR provided by your office. One will note the accident damage, structural nature of that damage and the fact the car was sold at auction, the traditional venue for cars that won't meet the standards of retail sales by dealers.

| Date | Source | Details |
|---|---|---|
| 09/29/2011 | New Jersey Damage Report | Accident reported Involving left front impact With another motor vehicle Left front primarily damaged |
| 09/29/2011 | Damage Report | Damage reported after accident or other incident Damage to left front |
| 09/12/2012 | New Jersey Damage Report | Accident reported Involving left front impact With another motor vehicle Left front primarily damaged Vehicle towed |
| 09/12/2012 | Damage Report | Damage reported after accident or other incident Damage to front |

*The above image was also captured from the CarFax VHR with the disclosure of the damage history. Note the two collision events, both to the left front of the vehicle shown with dates of 9-29-11 and 9-12-12.*

**Findings and Conclusion**
The vehicle had been damaged in a collision prior to Mr. Guidoi's purchase. It is my understanding that there were no post-sale collisions and that the condition the vehicle was in at the time of my inspection was how it was when purchased by Mr. Guidoi. This directly affects the vehicle's condition, safety, fitness merchantability and value. People in the market for used vehicles are very concerned about prior collision damage, particularly structural damage and distortion.

The structural damage and distortion noted in this report is serious in terms of where it manifests itself. That is, whenever one can see damage near to the cowl (firewall) of a vehicle, it shows the extent and severity of the front end damage. The distortion and damage in the left fender apron, the structural member to which the fender is bolted, was substantial enough to cause the fender bolt hole not be aligned with the mating threaded caged nut on the apron. The replacement fender's rear-most bolt hole had to be relieve in order to be installed on the distorted inner structure. The collision energy traveled the length of the apron.

The structural damage noted on the left front apron is the result of two (2) separate collision events. This fact will increase the tendency for the structural component to deform that much more readily than an undamaged vehicle would. The unibody, also known as the frame was compromised by the collision damage. Clearly this distortion is outside the accepted tolerances in the repair industry, even the generous 3mm standard the used car business will go by. The distortion is 6-8 mm.

The selling dealer either knew, or *should have known* the subject vehicle was substantially damaged in a collision, which is consistent

8

with the fact it was acquired at the wholesale auction. That is significant because the auction is a place where car dealers traditionally dispose of vehicles unfit for retail sale. In fact, there's no way anyone with experience in the automotive trade would have *not* seen the indications of the repairs, i.e. inconsistent paint mil thickness.

A vehicle with a unitized body design utilizes a construction with crush zones designed to absorb collision energy. In the event of a front end collision, these crush zones will collapse at a predetermined rate. This rapid deceleration will trigger an airbag (supplemental restraint systems-SRS) deployment. Any alteration (damage, repair, straightening, and the application of heat) to the structural members of the unibody will affect the reliable deployment of an airbag. Straightening steel will cause work hardening and the application of heat will cause high strength low alloy steel from which most structural parts are made, to lose its characteristics and become mild steel.

The subject Nissan was structurally damaged and distorted as the result of the collision damage and repairs. A vehicle with unibody construction relies heavily on the soundness of the body. Anything which would compromise it renders the car unfit, unsafe and unmerchantable. The tolerances of today's vehicles in terms of + or − any measurable amount demand accuracy in the repairs. Today's vehicles as well as current repair industry standards have zero (0) tolerance in structural dimensions, given the equipment and level of training available to body repair facilities. The amount of distortion which was evident in the subject vehicle's structure was clearly not within any known or accepted industry tolerances.

A collision damaged car is not what most consumers would want to purchase and it is for this reason that damaged vehicles---while presentable on their exterior---can be dangerous, unsafe vehicles to operate on public roads. Vehicles like this, with a history of collision damage are ones which would not enjoy a strong resale value and would be avoided in the marketplace. This consumer preference is evidenced by the growth in the online consumer databases such as CarFax and Experian AutoCheck, which are accessed by consumers to check vehicle histories on used cars. These databases give particular emphasis to collision and structural damage of a vehicle, but are notoriously incomplete and cannot be relied upon to exclude accidents or a claims history which would deter retail sales.

A used car inspection by a competent dealer should always determine aspects of a vehicle which are indicative of odometer tampering, prior use, prior owner abuse, collision damage and other effects which will determine the fitness of a vehicle to be sold, certified and/or guaranteed by a used car dealer. Such an inspection would provide a critical examination of the following conditions:

1. A vehicle's paint condition which included an examination of one's paint film thickness  (A scan with a digital paint film thickness gauge) which is indicative of collision repair and/or vehicle reconditioning.
2. Check a vehicle's paint for dirt in paint and other defects commonly found in refinishing, such as runs, drips, checking
3. Irregular body panel alignments, gaps, etc.
4. Non-OEM welds, such as MIG welds and aftermarket compression spot welds
5. Signs of usage inconsistent with the odometer mileage displayed such as brake pedal wear, interior deterioration, tears, rips, etc., worn suspension components
6. A thorough undercar inspection on a lift in which a qualified technician notes the condition of the suspension bushings, ball joints, CV joints and boots.
7. Evidence of frame and/or structural damage and repairs including welds, kinks, heat marks, fire damage, etc.
8. Evidence of flood and water damage including damage to interior components, upholstery, unusual corrosion of interior components
9. A vehicle history report such as CarFax or AutoCheck that detail the number of owners, mileage documents, fleet usage, daily rental use and collision events
10.  Excessive hinge wear such as bushing wear, misaligned and dropped doors which would indicate usage inconsistent with the mileage indicated
11. Excessive pedal wear (brake pedal in particular)
12. Installation and presence of non-OEM body panels and parts such as fenders, hoods, doors, bumper covers, reinforcements, cooling and A/C, suspension components.
13. Evidence of frame and/or structural repairs such as clamp marks on rocker panel pinch welds, elongation of reference holes in the body, chain attachment points
14. Uneven tire wear or wear patterns inconsistent with a properly aligned vehicle
15. Evidence of full body sectioning, aka clipping
16. Owner abuse such as excessive off-road use
17. Indications of excessive wheel travel (bottoming out)
18. Evidence of abrasion, excessive paint chipping or those consistent with hard use
19. Evidence of installation of non-metallic replacement painted bumper covers
20. Refinishing and/or repairs to non-metallic bumper covers
21. Indications of refinishing such as overspray, substandard practices such as failure to R&I body parts and/or improper preparation procedures
22. Checking of OBD II (onboard diagnostic) for airbag deployment history or other DTCs (diagnostic trouble codes).

A cursory inspection by anyone experienced in the automotive trade would have revealed evidence of prior collision damage. The selling dealer either knew, or *should have known* the subject vehicle was substantially damaged in a collision, not properly repaired, unsafe, and unfit for sale to the general public.

10

The subject vehicle had refinish work performed, based some irregular and high film thickness readings I observed at my inspection. Disclosure of the refinishing of more than two panels is required at Manheim Auto Auctions, the main outlet for vehicle sales for new and used car dealers. Persons in the market for used vehicles prefer the original coatings be intact and in good condition. Refinished panels are not as desirable in the used car market, as they are indicators of collision repair.

Furthermore, most OEM finishes are far more durable and free from failures and defects, which is the way refinish products have at times proven to be over the years. This is due to the many variables under which they are applied, i.e. environmental, equipment, personnel, training, and the technician's experience. Individuals in the automotive trade routinely scan vehicles with digital paint film thickness meters in an effort to detect those with collision repairs and to eliminate them from their purchase considerations.

Any mention of a history of collision damage---irrespective of the quality of repairs---would deter retail customers of a used car, or at the very least, decrease the amounts those persons would be willing to pay for such a car. In fact, many state laws require disclosure is made regarding the structural/frame damage at the time of sale by a licensed retail auto dealer.

A vehicle with collision repairs is inconsistent with the attributes of a first rate used car, as they have traditionally been shown to be prone to mechanical trouble, and on average their performance is less than that of an undamaged car. Furthermore, in the event of a subsequent collision on the same area previously damaged will tend to collapse more readily than an undamaged identical undamaged model. The molecular structure of steel used in auto body construction is known for its "memory," a term used in the repair industry to describe the tendency of straightened steel to revert to its damaged state and dimensions when it is in a subsequent collision.

While the Nissan had a current NJ state inspection sticker, it has been my experience over a career of 37 years that state inspections are more of a way of producing service sales for a service dealer than they are a reliable determination of a vehicle's absence of structural and frame damage. In fact, my own PA state inspection license examination contained no questions relating to the identification of the existence of structural damage, either existing or repaired.

The fact refinish coatings were applied to the vehicle's body adds considerable weight to the argument that the value is diminished. This occurs because the aftermarket coatings applied in a body shop are entirely unlike the factory finish in terms of their application method and chemical composition. It is for this reason that the refinished parts of the Nissan's body will age at different rates.

Most OEM finishes are far more durable and free from failures and defects, which is the way refinish products have at times proven to be over the years. This is due to the many variables under which they are applied, i.e. environmental, equipment, personnel, training, and the technician's experience. Individuals in the automotive trade routinely scan vehicles with digital paint film thickness meters in an effort to detect those with collision repairs and to eliminate them from their purchase considerations.

The subject Nissan has sustained *diminished value*, which is the loss based on the disclosure of the damage to a prospective buyer. In this age of information technology in which persons have access to more data than ever with respect to vehicles and events with an effect on their value, one would have to believe that a history of structural damage will have a profound effect on the subject vehicle. The vehicle is unsafe, unfit and unmerchantable in the retail market for used vehicles.

With respect to the methodology used to arrive at this diminished valuation figure, I consulted a standard treatise used in the auto industry, the Kelley Blue Book (KBB). The KBB system offers conditions from to choose from, which gave me a range of values, i.e. excellent condition is $7,642.00, good is $7,004.00, and fair is $6,190.00.

KBB, however, does not list a value for a vehicle in poor condition and indicates an independent appraisal is required. Based on the foregoing facts and conditions I therefore deem the vehicle to be in *poor* condition and appraise it at approximately $2,200.00.

I employed the identical methodology used for diminished value appraisals I have done for the last 17 years which were performed for insurance companies, new car dealers, consumers, and attorneys, the vast majority of which have been accepted.

I make the foregoing statements within a reasonable degree of automotive technical certainty and reserve the right to supplement this report as new information becomes available.

Yours truly,

Charlie Barone, ASE
PA Appraisers License #150444