# EXHIBIT B

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

Giancarlo Guido & Sandra Vasquez, individ.
& as H/W
1030 Lafayette Ave.
Hawthorne, NJ 07506

               Plaintiffs,       :     NO.: 14-8122

     v.

Ricardo Caballero
d/b/a Major Chevrolet, Inc.
43-40 Northern Blvd.
Long Island City, NY 11101

    And

Major Chevrolet, Inc.
43-40 Northern Blvd.
Long Island City, NY 11101

    And

Capital One Auto Finance, Inc.
1680 Capital One Dr.
McClean, VA 22102-3407       :    **JURY TRIAL DEMANDED**

    And

John Does 1-10

              Defendants.

### FIRST AMENDED CIVIL ACTION COMPLAINT

**I.**    **Jurisdiction and Venue**

1.    Jurisdiction in this Honorable Court is based on diversity conferred by 28 U.S.C. §1332; supplemental jurisdiction over state law claims is granted by 28 U.S.C. §1367.

2.    Venue lies in this district in that the events giving rise to this claim occurred here. Specifically the property which is the subject of this action is situated within this district.

## II.      Parties

3.      Plaintiffs, Giancarlo Guido and Sandra Vasquez, are married and adult individuals residing at the above-captioned address. Plaintiffs are citizens of New Jersey.

4.      Defendant, Major Chevrolet, Inc., is a corporation, respectively,  duly organized under the laws of the State of New York, doing business at the above-captioned address.  Upon information and belief, Defendant is a citizen of New York.

5.      Defendant, Ricardo Caballero, is an individual doing business at the above captioned address who, at all times material herein, acted individually, as employees of, as owners of, and/or doing business as Defendant Major World Chevrolet.  Upon information and belief, Defendant is a citizen of New York.

   a.      Said Defendants will hereinafter be collectively referred to as "Dealers".

6.      Capital One Auto Finance, Inc., is a corporation, duly organized and existing under the laws of the State of Virginia, with a headquarters at the above captioned address.  Upon information and belief, Defendant is a citizen of Virginia.

7.      Defendants, John Does 1-10, is a moniker/fictitious name for individuals and entities currently unknown but will be substituted when known, as affiliated, associated or liable hereunder for the reasons set forth below or inferred therefrom. Each of these parties are incorporated as Defendants in each and every count and averment listed above and below. Upon information and belief, Defendants, John Does, were agents, servants, workmen, or employees of Co-Defendant, liable to Plaintiffs hereunder.

## III.      Operative Facts

8.      On or about April 26, 2011, Plaintiffs purchased a 2008 Nissan Altima from Defendants, Dealers.  (Exh. A – Sales Contract).

9.      When Plaintiffs purchased the vehicle, Defendant, Ricardo Caballero, finance manager and his supervisor, Defendant, John Doe, represented that the car was in excellent condition. Caballero and his supervisor said the vehicle was "running really good" and that it only had one (1) previous owner.

10.     Caballero and his supervisor also provided Plaintiffs a Carfax report which did not show pre-existing to the vehicle.

11.     Upon information and belief, Plaintiff originally financed the vehicle purchase with Defendants, Dealers, who then assigned that financing to Defendants, Capital One Auto Finance. Pursuant to the express terms of the RISC, state common law of assignments, and statutory law, Capital One "stepped into the same shoes" as dealer Defendants and became derivatively, jointly, severally, and fully liable for all of the Dealer's misconduct.

12.     Defendant, Capital One has been collecting payments from Plaintiff of approximately $300 since on or about April 26, 2011.

13.     Around January 2014, Plaintiffs traded in the vehicle at a separate dealer in New Jersey and found out that it was worth much less than they expected.  The separate dealer showed Plaintiffs a Carfax report which disclosed structural damage to the vehicle on or around February 23, 2011 –a few months prior to Plaintiffs purchasing the vehicle.

14.     Had Plaintiffs known the vehicle was damaged prior to purchasing the vehicle, they never would have bought the car.  Plaintiffs relied on Defendants' false assurance that the Car Fax Report was correct and that the vehicle was in excellent condition.

15.     A cursory inspection by anyone experienced in the automotive trade would have revealed the pre-existing damage. (Exh. B).  Defendants are experienced in the automotive industry.

16.     Upon information and belief, a pre-sale inspection of the vehicle was never done and/or the after-market modifications were concealed from Plaintiffs.

17.     As a result of the aforesaid, Plaintiffs suffered significant financial harm and severe emotional distress.

<u>COUNT I</u>
**Violations of the Consumer Fraud Act, N.J.S.A., 56:8-68 et seq.**

18.     Plaintiff incorporates by reference the above paragraphs as if fully set forth at length herein.

19.     At all times material, the subject vehicle was owned by Plaintiff and was purchased and used primarily for personal, family and/or household use.

20.     The conduct of Defendants, by and through his agents, servants, workmen and employees, constituted "unfair or deceptive practices" within the meaning of the N.J. C.F.A.

21.     The CFA authorizes the Court, in its discretion, to award up to three (3) times ("treble") the actual damages sustained for violations, as well as attorney's fees, for which relief Plaintiffs are entitled.

VI.     **Prayer for Relief**

WHEREFORE, Plaintiffs request judgment in their favor and against Defendants, individually, jointly and severally, in an amount in excess of $75,000.00, including:

    a.      Compensatory, statutory, treble, and punitive damages;

    b.      Reasonable attorneys' fees, costs and interest; and

    c.      Such other and further relief as this Court may deem proper, including injunctive relief.

WEISBERG LAW

/s/ Matthew B. Weisberg
Matthew B. Weisberg, Esquire
David A. Berlin, Esquire
Attorneys for Plaintiffs

# EXHIBIT A

N.Y.S. LIC. 320, 7016226

**MAJOR WORLD .COM**

N.Y.S. D.C.A. NO. 0891824

Major Chevrolet, Inc.
43-40 Northern Blvd. • Long Island City, NY 11101 • (718) 937-3700

UC 558064

| FRANSICO | SOLD TO: GLORIA P HERNANDEZ-LOPEZ SANDRA P VASQUEZ |
| | ADDRESS 236 LINCOLN AVE |
| SALESMAN RICARDO CABALLERO | HAWTHORNE, NJ 07506-0000 | DATE 04/26/11 |

| MAKE | MODEL | | SERIAL/VIN NO. | COLOR | STOCK NO. | 51736 | |
|------|-------|--|----------------|-------|-----------|-------|--|
| 2008 NISSAN | ALTIMA | U | 1N4AL21E38N450036 | BL | PRICE OF CAR | 4 __ | 17,940.00 |
| | | | | | | | N/A |
| | | | 46,666 | | | 220A | N/A |
| | | | | | | | 0.00 |
| | | | | | | | N/A |
| GLCHERLO1@HOTMAIL.COM | | | | | LICENSE & TITLE | 300 | 285.00 |
| | | | | | | 806 | 75.00 |
| | | | | | SALES TAX | 324 | |
| | | | | | TOTAL CASH PRICE | | 19,955.00 |

| | | | |
|--|--|--|--|
| CAPITAL ONE AUTO FINANCE | DEPOSIT | 220D | N/A |
| | CASH ON DELIVERY | 220D | 2,000.00 |
| | USED CAR | 240 | N/A |
| | TYPE | | N/A |
| | SERIAL NO | | |
| | | 205 | |
| | 720 | 329.59 | 17,555.00 |
| | TOTAL | | 19,555.00 |

**IMPORTANT NOTICE TO USED CAR BUYER** • (a) STATE LAW REQUIRES THAT SELLERS OF SECOND HAND CARS CERTIFY IN WRITING TO THE BUYER THAT EACH CAR IS IN SAFE CONDITION AT THE TIME OF SALE. (b) THIS CERTIFICATION IS A GUARANTEE THAT THIS CAR IS IN SAFE CONDITION AT THE TIME OF SALE. (c) BUYER HAS A RIGHT TO REQUEST THE DEALER TO REPAIR OR TO PAY IN FULL FOR REPAIR ON ANY UNSAFE CONDITION IN THE CAR WHICH DOES NOT COMPLY WITH THIS CERTIFICATION. (d) THIS BUSINESS IS LICENSED BY THE DEPARTMENT OF CONSUMER AFFAIRS, 42 BROADWAY, N.Y., N.Y. 10004 COMPLAINT PHONE 212-487-4444 N.Y.C. D.C.A. NO. 0891824

*Dealer's optional fee for processing application for registration and/or certificate of title, and for securing special or distinctive plates (if applicable). THIS IS NOT A DMV FEE "0345"*

THIS VEHICLE RECEIVED IN GOOD CONDITION:   SIGN _____

"IF THIS MOTOR VEHICLE IS CLASSIFIED AS A USED MOTOR VEHICLE MAJOR CHEVROLET, Inc. CERTIFIES THAT THE ENTIRE VEHICLE IS IN CONDITION AND REPAIR TO RENDER, UNDER NORMAL USE, SATISFACTORY AND ADEQUATE SERVICE UPON THE PUBLIC HIGHWAY AT THE TIME OF DELIVERY."

| | | | | |
|---|---|---|---|---|
| VEHICLE PRICE | (+) | $ | 17,943.00 | |
| | (+) | | N/A | |
| | (+) | | N/A | |

**THIS ORDER SUPERCEDES ALL OTHER ORDERS**

*CASH OR CERTIFIED CHECK ONLY*

*ON DELIVERY*

X _____  4/26/2011

| | | |
|---|---|---|
| LESS TRADE-IN CREDIT (-) | | N/R |
| **CASH PRICE** | $ | 17,943.00 |

| | | | |
|---|---|---|---|
| SALES TAX | % (+) | | 1,535.00 |
| | (+) | | 75.00 |
| REGISTRATION FEE (ESTIMATE) | (+) | | 75.00 |
| TIRE REQUIRED TIRE RECYCLING ($2.50 per tire) | (+) | | 262.50 |
| INSPECTION FEE | | | N/A |
| OTHER – ITEMIZE | (+) | | N/A |
| **TOTAL CASH PRICE DELIVERED** | $ | | 19,333.00 |
| | (-) | | 2,000.00 |
| **CASH DUE ON DELIVERY** | $ | | 17,333.00 |

**IMPORTANT NOTICE TO USED CAR BUYER:**
(a) STATE LAW REQUIRES THAT SELLERS OF SECOND HAND CARS CERTIFY IN WRITING TO THE BUYER THAT EACH CAR IS IN SAFE CONDITION AT THE TIME OF SALE.
(b) THIS CERTIFICATION IS A GUARANTEE THAT THE CAR IS IN SAFE CONDITION AT THE TIME OF SALE.
(c) YOU HAVE A RIGHT TO REQUEST THE DEALER TO REPAIR OR TO PAY IN FULL FOR REPAIRS OF ANY UNSAFE CONDITION IN THE CAR WHICH DOES NOT COMPLY WITH THIS CERTIFICATION.
(d) THIS BUSINESS IS LICENSED BY THE DEPARTMENT OF CONSUMER AFFAIRS, 42 BROADWAY, NEW YORK, NEW YORK 10004.
N.Y.C. C.A. No. 0451524

**CANCELLATION STATEMENT**
IF THIS CONTRACT IS CANCELLED BY ME WITHOUT YOUR CONSENT, I UNDERSTAND I SHALL BE LIABLE TO YOU FOR LIQUIDATED DAMAGES IN THE AMOUNT OF $500., IN ACCORDANCE WITH PARAGRAPH THREE (3) (reverse side) OR ANY ADDITIONAL DAMAGES THAT YOU MAY INCUR THEREFROM.

| | | |
|---|---|---|
| BUYER'S SIGNATURE | | |
| CO-BUYER'S SIGNATURE SANDRA P VASQUEZ | DATE: | 04/26/11 |
| | DATE: | 04/26/11 |
| SELLER APPROVED BY: | DATE: | 04/26/11 |

**ONLY CERTIFIED CHECK OR CASH ACCEPTABLE ON DELIVERY**

RETAIL INSTALMENT CONTRACT

GMAC FLEXIBLE FINANCE PLAN

Dealer Number 7846226    Contract Number N/A

| Buyer (and Co-Buyer—name and address (include county and zip code)) | Creditor (Seller name and address) |
|---|---|
| GLORIA F HERNANDEZ-LOPEZ<br>SIMONE P VASQUEZ<br>226 LINCOLN AVE<br>HAWTHORNE, NJ 07506-0000 | MAJOR CHEVROLET INC<br>43-40 NORTHERN BOULEVARD<br>LONG ISLAND CITY, NY 11101-1829 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle described below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay us, the Creditor, the Amount Financed and Finance Charge according to the payment schedule shown below. We will figure the Finance Charge on a daily basis.

| New or Used | Year | Make and Model | Vehicle Identification No. | Primary Use for Which Purchased |
|---|---|---|---|---|
| USED | 2005 | NISSAN ALTIMA | 1N4AL11E25N458025 | ☒ personal, family, or household ☐ agricultural<br>☐ business ☐ ... |

Your trade-in is: Year N/A   Make N/A   Model N/A

### FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. | Total Sale Price<br>The total cost of your purchase on credit, including your downpayment of $ 2,091.00 |
|---|---|---|---|---|
| 16.490 % | $ 5,124.54 | $ 17,935.00 | $ 23,719.45 | $ 25,750.45 |

Insurance. You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

Check the insurance you want and sign below.

**Optional Credit Insurance.**
☐ Credit Life: ☐ Buyer ☐ Co-Buyer ☐ Both
☐ Credit Disability (Buyer Only)
Premiums
Credit Life $ _____ N/A
Credit Disability $ _____ N/A

(Insurance Company)

Your Payment Schedule Will Be:

| Number of Payments | Amount of Payments | When Payments Are Due | Or as Follows |
|---|---|---|---|
| 72 | $ 329.99 | Monthly beginning 05/26/11 | |

Late Charge. If a payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late, with a minimum charge of $1.

Prepayment. If you pay off all your debt early, you will not have to pay a penalty.

Security Interest. You are giving a security interest in the vehicle being purchased.

Additional Information. See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date and security interest.

(Home Office Address)

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. Credit life insurance pays only the amount you would owe if you paid all your payments on time. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for _____ ... the insurance ...

**Other Insurance.**
☐ _____ N/A _____ N/A
Type of Insurance    Term
Premium $ _____ N/A

N/A
(Insurance Company)

### ITEMIZATION OF AMOUNT FINANCED

| | | |
|---|---|---|
| 1 Cash price (including any accessories, services, and taxes) | $ | 17,940.00 |
| 2 Total downpayment = (If negative enter "0" and see line 4H below) | | |
| Gross trade-in $ N/A — (paid by us) $ N/A | | |
| + net trade-in $ N/A + cash $ 2,091.00 | $ | 2,091.00 |
| + other (describe) $ | | |
| 3 Unpaid balance of cash price (1 minus 2) | $ | 15,849.00 |
| 4 Other charges including amounts paid to others on your behalf (Seller may keep part of these amounts): | | |
| A Cost of optional credit insurance paid to insurance company or companies | | |
| Life $ N/A | | |
| Disability $ N/A | | |
| B Other insurance paid to the insurance company | $ | N/A |
| C Official fees paid to government agencies | $ | N/A |
| D Government taxes not included in cash price | $ | 1,632.65 |
| E Government license and/or registration fees | $ | 48.35 |
| F Government certificate of title fees | $ | N/A |
| G Other charges (Seller must identify who is paid and describe purpose) | | |
| to N/A for N/A | $ | N/A |
| to MAJOR CHEVROLET Document Fee | $ | |
| to N/A for N/A | $ | N/A |
| to N/A for N/A | $ | N/A |
| to N/A for N/A | $ | N/A |
| H Net trade-in payoff to N/A | $ | |

THE CONTRACT DOCUMENTS REFERRED TO IN THIS CONTRACT DOES NOT INCLUDE CONSUMER ...

(Signature)

(Date)

ITEMIZATION OF AMOUNT FINANCED

1 Cash price (including any accessories, services, and taxes)
2 Total downpayment = (if negative enter "0" and see line 4H below)     $   17,846.48

   Gross trade-in $
   - pay-off $                            N/A - cash trade in $
                                                              + cash $            N/A
   + other (describe)                                          $     3,586.13

3 Unpaid balance of cash price (1 minus 2)                               $     2,614.48

4 Other charges including amounts paid to others on your behalf (Seller may
   keep part of these amounts):
   A  Cost of optional credit insurance paid to the insurance
      company or companies                                               N/A
      Life                  $        N/A
      Disability            $        N/A
   B  Other insurance paid to the insurance company                      N/A
   C  Official fees paid to government agencies                          N/A
   D  Government taxes not included in cash price                        N/A
   E  Government license and/or registration fees                        N/A

                                                                         265.00
   G  ____ cost of life fees                                             $     ___.
   2- Other charges (Seller must identify who is paid and
      describe purpose.)

      to       N/A          for       N/A          $        N/A
      to   PAPER CHEVROLET Document Fee             $        N/A
      to       N/A          for       N/A          $        N/A
      to       N/A          for       N/A          $        N/A
      to       N/A          for       N/A          $        N/A

   H  Net trade-in (4A.2)                                                $
   Total other charges and amounts paid to others on your behalf

   E  Amount financed (3 + 4)

HOW THIS CONTRACT CAN BE CHANGED. This contract contains the ____ ____ between you and us relating to this contract. Any change to this
contract must be in writing and we must sign it. No oral changes are binding.
Buyer Signs X                                            Co-Buyer Signs X

Every part of this contract is not valid, all other parts stay valid. We ____ delay or refrain from enforcing any of our rights under this contract without losing them.
For example, we may extend the time for making some payments without ____ ____ the time for making others.

See back for other important agreements.

NOTICE TO BUYER: 1. Do not sign this Agreement before you read it or if it contains any blank space. 2. You are
entitled to a completely filled in copy of this agreement. 3. Under the law, you have a right to pay off in advance the full
amount due. If you do so, you may, depending on the nature of the credit service charge, either (a) prepay without
penalty, or (b) under certain circumstances obtain a rebate of the credit service charge. 4. According to law you have
the privilege of purchasing the insurance on the motor vehicle provided for in this contract from an agent or broker of
your own selection.

The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right
to receive a part of the Finance Charge.

You agree to the terms of this contract. You confirm before you signed this contract, we gave it to you, and you
were free to take it and review it. You confirm that you received a completely filled-in copy when you signed it.

RETAIL INSTALLMENT CONTRACT

Buyer Signs X  [signature]                          Date   04/26/11     Co-Buyer Signs X [signature]              Date   04/26/11

Other owner signs here X ____ — A co-buyer is a person who is responsible for ____ the entire debt. An other owner is a person whose name is on the ____
the vehicle but does not have to pay the debt. This other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here X                            Date                  Address

Creditor Signs ___ PAPER CHEVROLET INC   Date  04/26/11   By X

                                                    Title

Z109 FR-NY 8/2006 (3)-(For use in the State of New York) (1 of 4)
Copyright 2006 GMAC. All Rights Reserved.                Notice: See Other Side

DUPLICATE ORIGINAL - BUYER'S COPY

# EXHIBIT B



PO Box 275
Bryn Mawr, PA 19010
610 524 1234 V - 610 524 9023 F - 484 614 7210 C
info@autoclaimshelp.net / www.autoclaimshelp.net

**DRAFT**

10-7-14

Matt Weisberg
Weisberg Law Offices, PC
t/a Consumer Justice Alliance
7 S. Morton Ave.
Morton, PA 19070

Re: 2008 Nissan Altima S #1N4AL21E38N450036, Giancardo Guidoi

On this day I inspected the above referenced vehicle at the new owner's (Shania) residence in Patterson, NJ. The focus of my investigation was the determination of damage which pre-existed Mr. Giancardo's purchase of the Nissan, its condition, fitness, merchantability, value and safety.

In preparation for this report I reviewed the following documents furnished by your office:
1.   Lease from Paramus Hyundai for new Santa Fe with trade allowance of $2,500 for subject vehicle.
2.   Warranty (aftermarket) registration
3.   Invoice from Paramus Hyundai for optional equipment
4.   Receipt for $1,000.00 down payment
5.   NJ insurance card and registration
6.   CarFax VHR (clean) 4-26-2011
7.   CarFax (showing accident and structural damage) 1-18-14
8.   Business card Richard Caballero of Majorworld (dealer)
9.   Personal references for Majorworld loan
10.  Power of attorney
11.  Limited warranty Majorworld
12.  Major privacy notice
13.  Major rescission agreement
14.  Major arbitration agreement
15.  NJ temporary insurance card
16.  Liberty Mutual Insurance policy
17.  Major sales invoice to Gloria Hernandez et al
18.  RISC
19.  Invoice Major Chevrolet

1



The subject vehicle is shown in the above photo. It is a 2008 Nissan Altima convertible 107,030 miles on the odometer on the date of my inspection. The current Kelley Blue Book value is $7,167.00 for an identical Nissan in fair condition and without the history of collision damage.



The left side body panels paint film thickness is shown in the above image. One will note the inconsistency in the readings based on the fact there were body repairs and repainting on the left front door and quarter panel. One will note the inconsistency of the readings, an obvious indicator to a dealer conducting a pre-sale inspection for a vehicle being retailed to the public. There is an issue of durability of non-factory finishes as they have over the years been prone to failures due to inconsistency in technician training, facilities and equipment

2



The right side body panels paint film thickness is shown in the above image. One will note the inconsistency of the readings, an obvious indicator to a dealer conducting a pre-sale inspection for a vehicle being retailed to the public. There is an issue of durability of non-factory finishes as they have over the years been prone to failures due to inconsistency in technician training, facilities and equipment. Checking paint film thickness is a standard and simple procedure in the auto trade. This is an obvious item which any person in the automotive profession would have noticed and would have been uncovered in a standard presale inspection by a dealer selling vehicles in the retail market.

3



The above photo shows the left fender forward bolt with the distinctive tool marks of collision damage and repairs. Anyone in the industry would have seen this and a conscientious dealer would have investigated further.

4



The above image shows the rear-most left fender mounting bolt. One can easily see that the hole in the fender flange had to be relieved in order to install the bolt. This is indicative or two things: that the car's structure is distorted, and that the repairer was aware there was something wrong with the car's unibody and took steps to conceal it from the customer/owner. This condition would have been obvious to anyone in the trade and should have triggered a more thorough investigation into its cause.



The above photo shows some unrelated damage to the rear bumper cover on the right side.



The above image was captured from the lease for the new Hyundai for which the subject Altima was traded. Note the trade in allowance for the Altima of $2,500.00.



The above image was captured from the CarFax VHR on the subject vehicle. One will note the first two line items in the report indicating Structural Damage as well as Accident/Damage reported. These are very significant in that consumers first and foremost concern when buying used cars is accident history and damage.



The above image was captured from the second CarFax VHR provided by your office. One will note the accident damage, structural nature of that damage and the fact the car was sold at auction, the traditional venue for cars that won't meet the standards of retail sales by dealers.

| | | |
|---|---|---|
| 09/29/2011 | New Jersey Damage Report | Accident reported Involving left front impact With another motor vehicle Left front primarily damaged |
| 09/29/2011 | Damage Report | Damage reported after accident or other incident Damage to left front |
| 03/12/2012 | New Jersey Damage Report | Accident reported Involving left front impact With another motor vehicle Left front primarily damaged Vehicle towed |
| 08/12/2012 | Damage Report | Damage reported after accident or other incident Damage to front |

*The above image was also captured from the Carfax VHR with the disclosure of the damage history. Note the two collision events, both to the left front of the vehicle shown with dates of 9-29-11 and 9-12-12.*

**Findings and Conclusion**

The vehicle had been damaged in a collision prior to Mr. Guidoi's purchase. It is my understanding that there were no post-sale collisions and that the condition the vehicle was in at the time of my inspection was how it was when purchased by Mr. Guidoi. This directly affects the vehicle's condition, safety, fitness merchantability and value. People in the market for used vehicles are very concerned about prior collision damage, particularly structural damage and distortion.

The structural damage and distortion noted in this report is serious in terms of where it manifests itself. That is, whenever one can see damage near to the cowl (firewall) of a vehicle, it shows the extent and severity of the front end damage. The distortion and damage in the left fender apron, the structural member to which the fender is bolted, was substantial enough to cause the fender bolt hole not be aligned with the mating threaded caged nut on the apron. The replacement fender's rear-most bolt hole had to be relieve in order to be installed on the distorted inner structure. The collision energy traveled the length of the apron.

The structural damage noted on the left front apron is the result of two (2) separate collision events. This fact will increase the tendency for the structural component to deform that much more readily than an undamaged vehicle would. The unibody, also known as the frame was compromised by the collision damage. Clearly this distortion is outside the accepted tolerances in the repair industry, even the generous 3mm standard the used car business will go by. The distortion is 6-8 mm.

The selling dealer either knew, or *should have known* the subject vehicle was substantially damaged in a collision, which is consistent

8

with the fact it was acquired at the wholesale auction. That is significant because the auction is a place where car dealers traditionally dispose of vehicles unfit for retail sale. In fact, there's no way anyone with experience in the automotive trade would have not seen the indications of the repairs, i.e. inconsistent paint mil thickness.

A vehicle with a unitized body design utilizes a construction with crush zones designed to absorb collision energy. In the event of a front end collision, these crush zones will collapse at a predetermined rate. This rapid deceleration will trigger an airbag (supplemental restraint systems-SRS) deployment. Any alteration (damage, repair, straightening, and the application of heat) to the structural members of the unibody will affect the reliable deployment of an airbag. Straightening steel will cause work hardening and the application of heat will cause high strength low alloy steel from which most structural parts are made, to lose its characteristics and become mild steel.

The subject Nissan was structurally damaged and distorted as the result of the collision damage and repairs. A vehicle with unibody construction relies heavily on the soundness of the body. Anything which would compromise it renders the car unfit, unsafe and unmerchantable. The tolerances of today's vehicles in terms of + or any measurable amount demand accuracy in the repairs. Today's vehicles as well as current repair industry standards have zero (0) tolerance in structural dimensions, given the equipment and level of training available to body repair facilities. The amount of distortion which was evident in the subject vehicle's structure was clearly not within any known or accepted industry tolerances.

A collision damaged car is not what most consumers would want to purchase and it is for this reason that damaged vehicles---while presentable on their exterior---can be dangerous, unsafe vehicles to operate on public roads. Vehicles like this, with a history of collision damage are ones which would not enjoy a strong resale value and would be avoided in the marketplace. This consumer preference is evidenced by the growth in the online consumer databases such as CarFax and Experian AutoCheck, which are accessed by consumers to check vehicle histories on used cars. These databases give particular emphasis to collision and structural damage of a vehicle, but are notoriously incomplete and cannot be relied upon to exclude accidents or a claims history which would deter retail sales.

A used car inspection by a competent dealer should always determine aspects of a vehicle which are indicative of odometer tampering, prior use, prior owner abuse, collision damage and other effects which will determine the fitness of a vehicle to be sold, certified and/or guaranteed by a used car dealer. Such an inspection would provide a critical examination of the following conditions:

9

1. A vehicle's paint condition which included an examination of one's paint film thickness (A scan with a digital paint film thickness gauge) which is indicative of collision repair and/or vehicle reconditioning.
2. Check a vehicle's paint for dirt in paint and other defects commonly found in refinishing, such as runs, drips, checking
3. Irregular body panel alignments, gaps, etc.
4. Non-OEM welds, such as MIG welds and aftermarket compression spot welds
5. Signs of usage inconsistent with the odometer mileage displayed such as brake pedal wear, interior deterioration, tears, rips, etc., worn suspension components
6. A thorough undercar inspection on a lift in which a qualified technician notes the condition of the suspension bushings, ball joints, CV joints and boots.
7. Evidence of frame and/or structural damage and repairs including welds, kinks, heat marks, fire damage, etc.
8. Evidence of flood and water damage including damage to interior components, upholstery, unusual corrosion of interior components
9. A vehicle history report such as CarFax or AutoCheck that detail the number of owners, mileage documents, fleet usage, daily rental use and collision events
10. Excessive hinge wear such as bushing wear, misaligned and dropped doors which would indicate usage inconsistent with the mileage indicated
11. Excessive pedal wear (brake pedal in particular)
12. Installation and presence of non-OEM body panels and parts such as fenders, hoods, doors, bumper covers, reinforcements, cooling and A/C, suspension components.
13. Evidence of frame and/or structural repairs such as clamp marks on rocker panel pinch welds, elongation of reference holes in the body, chain attachment points
14. Uneven tire wear or wear patterns inconsistent with a properly aligned vehicle
15. Evidence of full body sectioning, aka clipping
16. Owner abuse such as excessive off-road use
17. Indications of excessive wheel travel (bottoming out)
18. Evidence of abrasion, excessive paint chipping or those consistent with hard use
19. Evidence of installation of non-metallic replacement painted bumper covers
20. Refinishing and/or repairs to non-metallic bumper covers
21. Indications of refinishing such as overspray, substandard practices such as failure to R&I body parts and/or improper preparation procedures
22. Checking of OBD II (onboard diagnostic) for airbag deployment history or other DTCs (diagnostic trouble codes).

A cursory inspection by anyone experienced in the automotive trade would have revealed evidence of prior collision damage. The selling dealer either knew, or *should have known* the subject vehicle was substantially damaged in a collision, not properly repaired, unsafe, and unfit for sale to the general public.

The subject vehicle had refinish work performed, based some irregular and high film thickness readings I observed at my inspection. Disclosure of the refinishing of more than two panels is required at Manheim Auto Auctions, the main outlet for vehicle sales for new and used car dealers. Persons in the market for used vehicles prefer the original coatings be intact and in good condition. Refinished panels are not as desirable in the used car market, as they are indicators of collision repair.

Furthermore, most OEM finishes are far more durable and free from failures and defects, which is the way refinish products have at times proven to be over the years. This is due to the many variables under which they are applied, i.e. environmental, equipment, personnel, training, and the technician's experience. Individuals in the automotive trade routinely scan vehicles with digital paint film thickness meters in an effort to detect those with collision repairs and to eliminate them from their purchase considerations.

Any mention of a history of collision damage---irrespective of the quality of repairs---would deter retail customers of a used car, or at the very least, decrease the amounts those persons would be willing to pay for such a car. In fact, many state laws require disclosure is made regarding the structural/frame damage at the time of sale by a licensed retail auto dealer.

A vehicle with collision repairs is inconsistent with the attributes of a first rate used car, as they have traditionally been shown to be prone to mechanical trouble, and on average their performance is less than that of an undamaged car. Furthermore, in the event of a subsequent collision on the same area previously damaged will tend to collapse more readily than an undamaged identical undamaged model. The molecular structure of steel used in auto body construction is known for its "memory," a term used in the repair industry to describe the tendency of straightened steel to revert to its damaged state and dimensions when it is in a subsequent collision.

While the Nissan had a current NJ state inspection sticker, it has been my experience over a career of 37 years that state inspections are more of a way of producing service sales for a service dealer than they are a reliable determination of a vehicle's absence of structural and frame damage. In fact, my own PA state inspection license examination contained no questions relating to the identification of the existence of structural damage, either existing or repaired.

The fact refinish coatings were applied to the vehicle's body adds considerable weight to the argument that the value is diminished. This occurs because the aftermarket coatings applied in a body shop are entirely unlike the factory finish in terms of their application method and chemical composition. It is for this reason that the refinished parts of the Nissan's body will age at different rates.

11

Most OEM finishes are far more durable and free from failures and defects, which is the way refinish products have at times proven to be over the years. This is due to the many variables under which they are applied, i.e. environmental, equipment, personnel, training, and the technician's experience. Individuals in the automotive trade routinely scan vehicles with digital paint film thickness meters in an effort to detect those with collision repairs and to eliminate them from their purchase considerations.

The subject Nissan has sustained *diminished value*, which is the loss based on the disclosure of the damage to a prospective buyer. In this age of information technology in which persons have access to more data than ever with respect to vehicles and events with an effect on their value, one would have to believe that a history of structural damage will have a profound effect on the subject vehicle. The vehicle is unsafe, unfit and unmerchantable in the retail market for used vehicles.

With respect to the methodology used to arrive at this diminished valuation figure, I consulted a standard treatise used in the auto industry, the Kelley Blue Book (KBB). The KBB system offers conditions from to choose from, which gave me a range of values, i.e. excellent condition is $7,642.00, good is $7,004.00, and fair is $6,190.00.

KBB, however, does not list a value for a vehicle in poor condition and indicates an independent appraisal is required. Based on the foregoing facts and conditions I therefore deem the vehicle to be in *poor* condition and appraise it at approximately $2,200.00.

I employed the identical methodology used for diminished value appraisals I have done for the last 17 years which were performed for insurance companies, new car dealers, consumers, and attorneys, the vast majority of which have been accepted.

I make the foregoing statements within a reasonable degree of automotive technical certainty and reserve the right to supplement this report as new information becomes available.

Yours truly,

Charlie Barone, ASE
PA Appraisers License #150444